**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:

     THE GREAT ATLANTIC & PACIFIC
     TEA COMPANY, INC., *et al.*

                Debtors.

-------------------------------------------------------------------x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS on behalf of the bankruptcy estate of
THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC., *et al.*,

                Plaintiff,

       - against -

McKESSON PHARMACY SYSTEMS LLC,
                Defendant.

-------------------------------------------------------------------x

**FOR PUBLICATION**
Chapter 11
Case No. 15-23007 (LGB)

Adv. Proc. No. 17-08265 (LGB)

## <u>MEMORANDUM OPINION REGARDING</u> <u>SYSTEMS PREFERENCE ALLEGATIONS</u>

### <u>APPEARANCES</u>

BUCHALTER
*Attorneys for McKesson Corporation*
18400 Von Karman Avenue
Irvine, CA 92612
By:   Jeffrey Garfinkle

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for McKesson Corporation*
200 West 21st Street, 17th Floor
New York, NY 10036
By:   Tracy Klestadt

MILIN LAW PLLC
*Attorneys for the Official Committee of Unsecured Creditors*
*and Special Counsel for the Debtor*
18 East 12th Street, 2nd Floor
New York, NY 10003
By:   Michael Hamersky
       Richard Milin

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

After a long and winding procedural journey, this adversary proceeding (the "Systems Adversary Proceeding") between the Official Committee of Unsecured Creditors on behalf of the bankruptcy estate of The Great Atlantic & Pacific Tea Company (the "Committee" or "Plaintiff") and McKesson Pharmacy Systems LLC (the "Defendant" or "McKesson Systems", and together with the Committee, the "Parties") comes to an end.[1]  The Court held a trial from July 12 through July 18, 2024 (the "Trial") and heard fact and expert witness testimony.  On October 9, 2024, the Court heard the Parties' final legal arguments.  Now, the Court's decision on the surviving issues are set forth here and in three other related opinions.[2]  This opinion (the "Systems Preference Opinion") shall resolve whether the various payments made from the Debtor to McKesson Systems during the 90-day period prior to the Petition Date, April 20, 2015 through July 18, 2015 (the "Preference Period"), were preferential transfers, and whether McKesson Systems has valid defenses to those allegations.

---

[1] On July 19, 2015 (the "Petition Date"), The Great Atlantic & Pacific Tea Company, Inc. ("A&P") and several of its affiliated entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (Bankr. S.D.N.Y. 2015) [Main Case ECF No. 1] (the "Main Case").  The Debtors' Chapter 11 cases were jointly administered under Case No. 15-23007 (RDD). (Am. Compl. ¶ 13).  The only remaining debtor is The Great Atlantic & Pacific Tea Company, Inc. (the "Debtor") (Am. Compl. ¶¶ 6 and 13).  On July 24, 2015, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors pursuant to § 1102 of the Bankruptcy Code. (Am. Compl. ¶ 4).  The Committee consists of (i) 1199SEIU Health Care Employees Pension Fund, (ii) Basser-Kaufman, Inc., (iii) C&S Wholesale Grocers, Inc., (iv) CBA Industries, Inc., (v) McKesson Corporation, (vi) Pension Benefit Guaranty Corporation and (vii) United Food and Commercial Workers International Union. (Am. Compl. ¶ 4).  On June 6, 2016, the Court authorized the Committee to prosecute avoidance actions on behalf of the Debtors' estates. (Am. Compl. ¶ 5).

[2] In addition to this Systems Preference Opinion, the Court shall issue the: (i) "Preference & Stay Violations Opinion" on the docket of Adv. Proc. No. 17-08264 (LGB) (the "Primary Proceeding"), (ii) the "Claims Opinion" on the dockets of the Primary Proceeding and the Main Case, and (iii) the "Specialty Preference Opinion" on the docket of Adv. Proc. No. 17-08266 (LGB) (the "Specialty Adversary Proceeding").

2

## I.   PROCEDURAL HISTORY

On July 13, 2017, the Plaintiff initiated this Systems Adversary Proceeding by filing its Complaint against McKesson Systems.  *See* Compl. [ECF No. 1].[3]  The Complaint sought the avoidance and recovery of 16 payments made by the Debtor to McKesson Systems, totaling $323,260.11, during the Preference Period.  *See id.* at Ex. A.  The first claim for relief is brought pursuant to § 547 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), and the second is brought pursuant to § 550(a) of the Bankruptcy Code.  *See id.* at ¶¶ 13–22, 23–26.

On August 10, 2017, McKesson Systems filed its Answer to the Complaint.  McKesson System's Answer to Compl. [ECF No. 4] (the "Answer").  McKesson Systems asserted various defenses set forth in § 547(c) of the Bankruptcy Code, including the ordinary course of business, contemporaneous exchange, and subsequent new value defenses, as well as a setoff or recoupment defense to the extent that McKesson Systems provided goods to the Debtor after the Petition Date for which payment was never received.  *See* Answer at ¶¶ 23–27.

Following the filing of the Answer, the Committee and McKesson Systems conducted an initial round of discovery and participated in a mediation that was ultimately unsuccessful.  *See* Mem. of Mediator Allan L. Gropper [ECF No. 20].  As discussed in more detail in the Preference & Stay Violations Opinion issued concurrently with this Opinion, McKesson thereafter filed several motions for summary judgment regarding the alleged preferential transfers in the Primary Proceeding, and the Debtor filed an Amended Complaint in the Primary Proceeding, to which McKesson responded with a Motion to Dismiss.  *See* Preference & Stay Violations Opinion at 4–6.  The issues resolved in that litigation are not directly applicable to the issues in this Opinion,

---

[3] Unless otherwise specified, all citations are to the Systems Adversary Proceeding: *The Official Committee of Unsecured Creditors on Behalf of the Bankruptcy Estate of The Great Atlantic & Pacific Tea Company Inc., et al. v. McKesson Pharmacy Systems LLC*, No. 17-08265 (Bankr. S.D.N.Y. 2017).

but as discussed below, are related to the resolution of the issues in this Systems Adversary Proceeding.

The parties subsequently proceeded to trial (the "Trial") on all remaining issues between the Plaintiff, McKesson, McKesson Systems, and McKesson Specialty Distribution LLC across the Main Case, the Primary Proceeding, the Systems Adversary Proceeding, and the Specialty Adversary Proceeding. On July 1, 2024, McKesson Systems filed its Opening Trial Brief [ECF No. 73]. On July 2, 2024, the Court entered its First Amended Pretrial Order [ECF No. 80]. On July 8, 2024, the Plaintiff filed its Pre-Trial Memorandum of Law [ECF No. 81]. Admitted as exhibits at the Trial included expert reports prepared by both the Plaintiff and McKesson Systems relating to the preference allegations in the Systems Adversary Proceeding.[4]

The Trial was held from July 12, 2024, to July 18, 2024. Following the Trial, the Court ordered the parties to submit post-trial briefing and scheduled closing arguments. *See* Order Scheduling Post-Trial Briefing and Closing Arguments [ECF No. 93]. On September 16, 2024, McKesson Systems filed its Post-Trial Brief Submitted by the McKesson Entities [ECF No. 99], and its Request for Judicial Notice Submitted by McKesson Entities in Support of Post-Trial Brief [ECF No. 100]. On the same day, the Committee filed its Post-Trial Memorandum of Law [ECF No. 101]. The Court heard the Parties' closing arguments on October 9, 2024. *See* Oct. 9, 2024 Hr'g Tr. [ECF No. 102].

Other than in discrete sections of the Parties' post-trial briefing, the Parties did not submit other briefs specific to the issues in this Systems Adversary Proceeding. The Parties additionally submitted expert reports, which set forth many of the facts and analysis relevant to the claims in

---

[4] *See* Expert Report of Charles M. Berk, CPA, CFF, CIRA of CBIZ Accounting, Tax & Advisory of New York, LLC, dated May 6, 2021 [McK 45] (the "Berk Report"); Expert Report of William J. Pederson of EisnerAmper LLP, dated July 29, 2021 [PX 230] (the "Pederson Report").

this case. The Parties also submitted into evidence several declarations relevant to the issues in this Systems Adversary Proceeding.[5] The Parties incorporate into this case some of the arguments made in the Primary Proceeding as to the preference allegations there. This is due to some overlap between the legal issues presented.

## II. RELEVANT FACTUAL BACKGROUND

A&P contracted with McKesson Systems to provide pharmacy enterprise software to manage A&P's inventory, product orders and payments (the "System Software"). *See* First Amended Pretrial Order at ¶ 14. The System Software utilized an electronic daily ordering system. *See id.* The Parties' relationship was purportedly governed by a Master License and Services Agreement, dated May 10, 2007 (the "License Agreement") (PX 185), which was amended in 2008 (PX 186) and again in 2013 (PX 187) to add certain A&P stores to the usage of the System Software, to modify fees, and to state McKesson Systems as the successor-in-interest to the previous software service provider, Per-Se Technologies. *See* Berk Report at 11-12. Pursuant to the License Agreement, McKesson Systems licensed to A&P the right to access and use the System Software, and provided to A&P related professional and ongoing support services. *See id.* at 12.

McKesson Systems billed A&P monthly for all fees incurred via electronic invoice, and A&P was to pay in full each monthly invoice within 30 days following receipt of an invoice ("Net 30 Terms"). *See id.* The types of fees incurred by A&P pursuant to the License Agreement included: (1) a "facility based fee" (license fees calculated based on the number of A&P facilities utilizing the System software); (2) a one-time, upfront "implementation fee" and all pre-approved

---

[5] *See* Preference Decl. of T. Carnahan: McKesson's Actions to Pressure A&P to Pay [ECF No. 82]; Decl. of J. Towsley Direct Trial Testimony Proffered by the McKesson Entities [ECF No. 74]; Decl. of C. Berk; Direct Trial Testimony Proffered by McKesson Entities [ECF No. 78]; S&P Decl. of D. DeVito: McKesson Specialty and Pharmacy [ECF No. 86].

travel and shipping related expenses from initial implementation activities; (3) "interface fees" and all pre-approved travel and shipping related expenses arising from interface development activities; and (4) one-time, upfront hosting configuration, setup, and training ("HCST") fee and all pre-approved travel and shipping related expenses arising from HCST activities invoiced on a monthly basis. *See id.*; License Agreement at 17-18.  All payments were to be made in United States currency and via electronic funds transfer ("EFT").

During the Preference Period, A&P purportedly made 10 payments to McKesson Systems on account of 16 different invoices in the aggregate amount of $323,260.11, as set forth below:

| Complaint Payment Date | Payment Date (Asserted by McKesson) | Invoice Date | Payment Amount | Complaint Payment Date | Payment Date (Asserted by McKesson) | Invoice Date | Payment Amount |
|---|---|---|---|---|---|---|---|
| 4/24/2015 | 4/24/2015 | 3/18/2025 | $1,085.92 | 6/16/2015 | 6/15/2015 | 5/12/2015 | $7,520.27 |
| 4/29/2015 | 4/28/2015 | 3/25/2015 | $85.60 | 6/19/2015 | 6/18/2015 | 5/8/2015 | $84.80 |
| 5/4/2015 | 5/02/2015 | 3/27/2015 | $107.28 | 6/29/2015 | 6/28/2015 | 5/19/2015 | $104.13 |
| 5/19/2015 | 5/19/2015 | 4/15/2015 | $337.70 | 6/29/2015 | 6/28/2015 | 5/22/2015 | $6,828.12 |
| 5/19/2015 | 5/19/2015 | 4/15/2015 | $107.28 | 7/1/2015 | 6/30/2015 | 5/27/2015 | $99,578.20 |
| 5/19/2015 | 5/19/2015 | 4/14/2015 | $7,927.45 | 7/1/2015 | 6/30/2015 | 5/27/2015 | $40.00 |
| 5/19/2015 | 5/19/2015 | 4/14/2015 | $147.28 | 7/10/2015 | 7/10/2015 | 6/5/2015 | $149.68 |
| 5/19/2015 | 5/19/2015 | 3/25/2015 | $99,578.20 | 7/13/2015 | 7/11/2015 | 6/8/2015 | $99,578.20 |

*See* Compl., Ex. A.  McKesson Systems did not dispute the payment amounts alleged in the Complaint, but after undertaking its own review of transaction data and "a listing of the invoice history" from its SAP and Epicor enterprise software systems, McKesson Systems does dispute some of the payment dates of the transfers at issue here, as set forth above.[6]

---

[6] Through the course of the Parties' expert reports and post-trial briefing, the Plaintiff did not seem to dispute McKesson Systems' revised payment dates, and, for example, seemed to implicitly accept them with respect to McKesson Systems' ordinary course and new value defenses.  In any event, the Court finds that these alleged

Additionally, in the nine months prior to the Preference Period, A&P purportedly made 32 payments to McKesson Systems on account of 51 invoices in the aggregate amount of $1,003,423.22, all on Net 30 Terms.  *See* Berk Expert Report at 16, Ex. 2.

## III.  **DISCUSSION**

### A.  **The Plaintiff's *Prima Facie* § 547(b) Case**

Under § 547(b), the Plaintiff may avoid any transfer of an interest of the debtor in property: (1) to or for the benefit of the creditor; (2) for or on account of an antecedent debt; (3) made while the debtor is insolvent; (4)(A) made on or within 90 days prior to the filing of the petition; and (5) that enables such creditor to receive more than they would have received if: (A) the debtor had liquidated under Chapter 7; (B) such transfer had not been made, and (C) such creditor received payment of such debt to the extent provided under the Bankruptcy Code.  11 U.S.C. § 547(b).  The Plaintiff bears the burden of proving each element of § 547(b) by a preponderance of the evidence. *See In re Roblin Indus., Inc.*, 78 F.3d 30, 34 (2d Cir. 1996).  If the Plaintiff shows that all five of these requirements are met here, the transfers are *prima facie* preferential *See In re NWL Holdings, Inc.*, No. 08–12847, 2013 WL 2436667, at *2 (Bankr. D. Del. June 4, 2013).

In the Plaintiff's Complaint, it asserted that each of the requirements above were met here. *See* Complaint at ¶¶ 14-20.  At Trial, the Plaintiff specifically asserted § 547(b)(5)'s fifth requirement was met here, that the transfers at issue in this case enabled McKesson Systems to receive more than it would have received if the case were a case under chapter 7 of the Bankruptcy Code, the transfer has not been made, and McKesson Systems received payment of the debt to the extent provided by the Bankruptcy Code.  *See* First Amended Pretrial Order at 15.  In its Answer,

---

differences do not materially affect the Court's analysis of the issues as set forth below, and will credit McKesson Systems' alleged payment dates rather than those set forth in the Complaint.

McKesson Systems denied knowledge or information sufficient to have a belief as to the truth of the Plaintiff's allegations as to the § 547(b) requirements. *See* Answer at ¶ 1. At Trial and thereafter, McKesson Systems did not expressly contest that any of the five requirements of § 547(b)(5) were not met here. *See* First Amended Pretrial Order at 15-17; McKesson's Post-Trial Brief [ECF No. 99] at 47-48. Further, the Parties only included McKesson Systems' § 547(c)(4) defenses as "issues to be tried" at Trial. *See id.* at 18.

The Court finds that all five requirements are met here. As an initial matter, it is clear that the transfers here were property of the debtor in the form of cash. As to the first § 547(b) requirement, the evidence did not suggest that the transfers here were made for the benefit of any entity or person other than McKesson Systems, and McKesson Systems did not offer any evidence to the contrary. Additionally, that McKesson Systems was a creditor of the debtor[7] at the time of the transfers is also apparent given that McKesson Systems had a right to payment upon providing the specific goods and services on which account the transfers here were made.

As to the second requirement, the Parties in the course of their expert reports, briefing, and testimony at Trial also make clear that the transfers at issue here were all credit-based transactions on Net 30 Terms, where the goods and services in question were delivered or provided prior to the transfers, and that therefore these transfers were made on account of antecedent debts that arose upon the delivery or provision of the goods and services in question. *See Togut v. Barasky (In re Kossoff PLLC)*, 673 B.R. 253, 265 (Bankr. S.D.N.Y. 2025) (quoting *Pereira v. Lehigh Sav. Bank, SLA (In re Artha Mgmt., Inc.)*, 174 B.R. 671, 678 (Bankr. S.D.N.Y. 1994) ("For purposes of a

---

[7] "Creditor" is defined by the Bankruptcy Code as "an entity with a claim against the debtor that arose" at or before the Petition Date. 11 U.S.C. § 101(10)(A)). A "claim" is defined as any: "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. 11 U.S.C. § 101(5).

voidable preference action under Section 547(b)(2), an 'antecedent debt' is 'a debt which is incurred prior to the relevant transfer'. . . [a]nd 'a debt is incurred . . . when it arises and not when payment becomes due.'").

As to the third requirement, there is a rebuttable presumption of insolvency that the debtor is insolvent during the 90 days before the petition date, which McKesson Systems failed to rebut. *See Roblin*, 78 F.3d at 34. As to the fourth requirement, the Parties did not disagree that all of the transfers at issue here did indeed occur on or within 90 days of the Petition Date.

> 1. Did the Transfers Enable McKesson Systems to Receive More Than It Would Have Otherwise Recovered in a Chapter 7 Liquidation, As Required Under § 547(b)(5)?

The fifth requirement for § 547(b) is met "whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution." *See Savage & Assocs., P.C., v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). Additionally, each transfer's preferential status is to be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936). The party seeking avoidance has the initial burden of showing that the creditor would have recovered less in liquidation than the value of the pre-petition transfers by constructing a "hypothetical [C]hapter 7 case and determin[ing] the percentage distribution [each class of claims] would have received on the petition date." *In re Wonderwork, Inc.*, 611 B.R. 169, 213 (Bankr. S.D.N.Y. 2020).

Thus, when the creditor-transferee is not secured and claims within the same priority class would not fully recover in the hypothetical Chapter 7 distribution, any transfers made during the preference period on account of the creditor-transferee are deemed to have allowed excessive

9

recovery. *See Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996) (*citing Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985) ("As long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made."). Further, any costs that would be associated with administering the Chapter 7 proceeding must be included in the priority distribution. *See McColley v. Navaro Gem Ltd. (In re Candor Diamond Corp.)*, 68 B.R. 588, 595 (Bankr. S.D.N.Y. 1986). Critically, the Chapter 7 trustee fee of roughly 3% of the total funds disbursed must be satisfied prior to other priority or non-priority unsecured debt, including any section 503(b) administrative claims. 11 U.S.C. § 507(a)(1)(C-D).

This Court has allowed fact-finders to utilize many forms of evidentiary support to construct the hypothetical Chapter 7 case and determine proper distributions. *See In re Candor Diamond,* 68 B.R. at 595 (combining deposition testimony, filed claims and prior court orders to estimate distributions and conclude excessive recovery); *see also In re Teligent, Inc.,* 380 B.R. at 339-42 (examining Plan, Disclosure Statement, Confirmation Order, monthly operating reports, and various Riders to the Statement of Financial Affairs to determine whether information was sufficient to construct hypothetical Chapter 7 liquidation); *In re CIS Corp.*, 195 B.R. at 262-63 (calculating hypothetical recovery and finding insolvency when trustee testified to contents of valuation studies, accounts receivable billing, and remarketing agreements).

Where as here, the allegedly preferential transfers were on account of unsecured, non-priority claims, the Court concludes that McKesson Systems would, more likely than not, have recovered nothing in a chapter 7 liquidation.[8] At the time of filing, the Debtor's schedules show

---

[8] McKesson Systems did not assert that it had any § 503(b)(9) or other priority claims as McKesson had asserted in the Primary Proceeding. Indeed, none of the invoice dates here occurred within the twenty days before the Petition

assets of $601,441,108.28, burdened by approximately $925 million in secured debt and $1.2

billion of general unsecured claims.  *See* Summary of Schedules, Schedules of Assets and

Liabilities and Stmt. of Fin. Affairs for the Great Atl. and Pac. Tea Co. [Main Case ECF No. 720]

at 37.  In a chapter 7 liquidation, the Debtor's available assets would have had to be liquidated in

a fire sale, and the proceeds would have to be applied to satisfy the $925 million in secured debt.

Since most of the Debtor's assets were subject to the secured lender's liens,[9] the Court finds it

highly implausible that the Debtor would have been able to generate asset sale proceeds to pay

100% of not only the $925 million in secured debt, but also 100% of the approximately $1.2 billion

general unsecured claims pool.

Thus, the Court finds that the Plaintiff has shown by a preponderance of the evidence that

McKesson Systems' receipt of the allegedly preferential transfers would have resulted in an

outsized recovery for McKesson Systems, and so the Plaintiff has met their burden to establish a

*prima facie* preference claim with respect to these allegedly preferential transfers.

**B.  Were Any of the Transfers Made in the Ordinary Course of Business?**

The ordinary course of business defense generally applies when transfers are "recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee." *Official Comm. of Unsecured Creditors of Enron Corp. v.*

*Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007)

(citation omitted).  McKesson Systems must establish the ordinary course of business defense by

---

Date.  Thus, the Court does not analyze here the hypothetical chapter 7 recovery for any § 503(b)(9) or other priority claims.

[9] *See, e.g.*, Motion of Debtors for Interim and Final Authority to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Use Cash Collateral Pursuant to 11 U.S.C. 363(c)(2), (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) [Main Case ECF No. 18] at ¶ 5.

a preponderance of the evidence. *See id.* at 458. It may do so by either showing that: (1) the payments are not avoidable under § 547(c)(2)(A)'s "subjective" test, or (ii) the payments are not avoidable under § 547(c)(2)(B)'s "objective" test. *See* 11 U.S.C. § 547(c)(2) (using conjunction "or" between subsections (A) and (B) in § 547(c)(2)).

### 1. The Subjective Test

§ 547(c)(2)(A)'s subjective test focuses on the business relationship or financial affairs between the particular debtor and transferee in each case, and requires consideration of six factors:

(i) the prior course of dealing between the parties,
(ii) the amount of the payment,
(iii) the timing of the payment,
(iv) the circumstances of the payment,
(v) the presence of unusual debt collection practices, and
(vi) changes in the means of payment.

*Pereira v. UPS (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 827-28 (Bankr. S.D.N.Y. 2014) (citing *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd. (In re Pameco Corp.)*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006); *see also Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005); *Hassett v. Goetzmann (In re CIS Corp.)*, 195 B.R. 251, 258 (Bankr. S.D.N.Y. 1996)).

### a. The Facility Based Fees

Three of the Transfers here were for $99,578.20 each, which the Parties agree were for the monthly recurring "facility based fee" owed to McKesson Systems pursuant to the License Agreement (together, the "Facility Based Fees").[10] *See* Pederson Report at 8. These three Facility Based Fee payments account for $298,734.60 of the $323,360 total of transfers at issue here.

---

[10] The underlying invoices for each of these Facility Based Fees were also introduced into evidence at McK 48, 53, 55, and 57.

12

McKesson Systems also admits that one of these three Facility Based Fee payments, the one dated May 19, 2015 (with an invoice date of March 25, 2015), is not shielded by the ordinary course defense.[11] Thus, the Court will only analyze the ordinary course defense as to the two other Facility Based Fee payments paid on June 30 and July 11, 2015, with invoice dates of May 27, 2015 and June 8, 2015. Additionally, since the Parties focused their expert reports largely on these transfers, the Court finds it helpful to first analyze the ordinary course defense as to these three transfers, and then separately next analyze McKesson System's § 547(c)(2)(A) ordinary course defense as to the remaining 13 transfers (the "Remaining Transfers").

i.    The Prior Course of Dealing Between the Parties

For this factor, McKesson Systems must establish a "baseline of dealings," demonstrating some consistency between the Preference Period payment practices with other non-Preference Period payment practices between the debtor and the creditor." *See Pereira*, 508 B.R. at 828. Late payments alone are presumptively nonordinary, but that presumption may be rebutted through showing that such late payments were the standard course of dealing between the parties. *See Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, No. 06-12737, 2010 Bankr. LEXIS 3941, at *8-9 (Bankr. S.D.N.Y. Nov. 4, 2010). In so rebutting, courts look to a comparison between the average lateness of payments in the pre-preference period and the average lateness of payments in the post-preference period to determine whether late payments during the preference period are ordinary or not. *See Pereira* at 828. This generally involves comparing the average number of days between the invoice and payment dates during the pre-preference and preference periods. *Davis v. Clarklift-West, Inc. (In re Quebecor World (USA), Inc.)*, 518 B.R.

---

[11] Though McKesson Systems' expert Berk does not expressly state so, it is clear that after reviewing the historical period transfers, that this March 25, 2015 invoice was an accelerated invoice, as Facility Based Fee invoices were always issued on the first of the month in the prior five months before the Preference Period. *See* Pederson Report at 8; Berk Report at Ex. 1 & 2.

13

757, 762 (Bankr. S.D.N.Y. 2014); *Jacobs*, No. 06-12737, 2010 Bankr. LEXIS 3941, at \*9-10.

"Although a narrow band of difference is acceptable, payments delayed beyond a reasonable amount of time past the pre-preference period average generally do not fall within the ordinary course of business. *See Quebecor World*, 518 B.R. at 763. Additionally, courts reject the argument that any preference period payment is ordinary if it falls anywhere within the minimum and maximum number of days from invoice to payment during the historical period. *See id.* Courts have also found that where payments are made more than anywhere from 16 to 30 days after the pre-preference period average time, such transfers would not be in the ordinary course. *See Jacobs*, No. 06-12737, 2010 Bankr. LEXIS 3941, at \*11-12 (collecting cases); *Quebecor World*, 518 B.R. at 763-64 (collecting cases). Conversely, courts have found that payments are ordinary when made anywhere from 5 to 21 days after the pre-preference period average time. *See Ryniker v. Kaufmann (In re Décor Holdings, Inc.)*, 2022 Bankr. LEXIS 303, at \*10-11 (Bankr. E.D.N.Y. 2022) (collecting cases).

McKesson Systems' primary argument on this factor is that while all the payments made during the Preference Period in this case were made late, the presumption that such late payments are non-ordinary is rebutted after comparing the average lateness of payments in the historical period with the same during the Preference Period, and concluding that it was the Parties' baseline practice to, on average, pay late in a manner that was reasonably consistent with the lateness of payments during the Preference Period. *See* Berk Report at 17-19. McKesson Systems' expert Berk formulated two "average lateness" ranges, one for the historical, pre-preference period and one for the Preference Period, and compares them to one another to determine whether the late payments made during the Preference Period are ordinary. *See id.*

Berk concludes that based on the pre-preference period data consisting of 51 payments on account of 51 invoices, the mean average lateness range was 1 to 19 days (average +/- one standard deviation) after the due date, with a mean average of 10.1 days. *See* Berk Report at 17-18. After analyzing the Preference Period data consisting of 10 payments on account of 16 invoices, Berk concludes that the mean average lateness range was 1 to 12 days (average +/- one standard deviation), with a mean average of 7 days after the due date. *See id.* at 18-19. Berk then asserts that 15 of the 16 invoices paid during the Preference Period fall within their historical period average lateness range of 1-19 days, and therefore those payments are shielded by the ordinary course defense. *See id.* at 18-19.

The Plaintiff counters that Berk's average lateness analysis is flawed primarily for one reason. *See* Pederson Report at 10-11. The Plaintiff argues that there is a $42.80 outlier payment that should be excluded from the average lateness range because it is extraordinarily far outside the range of lateness of all other historical period payments and seems to have resulted from an accounting oversight rather than a valid business reason. *See id.* If this $42.80 outlier payment is excluded, the Plaintiff argues that a revised mean average lateness range for the historical period range would be 4 to 13 days (not 1 to 19) with a mean average of 9 days (not 10 days). *See id.* The Plaintiff then concludes that 5 of the 10 non-Facility Based Fee payments, as well as the two Facility Based Fee payments that McKesson Systems asserts were in the ordinary course, would then fall outside the modified average lateness range. *See id.*

The Court concludes that McKesson Systems' average lateness analysis weighs in favor of its ordinary course defense and is evidence that the Facility Based Fee payments were not un-ordinary as a result of being late payments. As courts have noted before, a narrow band of difference is acceptable between the pre-preference period and Preference Period averages. S*ee*

15

*Quebecor World*, 518 B.R. at 763.  In particular, courts have found that where the averages are within 5 to 21 days of one another, those transfers would be ordinary with respect to their lateness. *See Ryniker*, 2022 Bankr. LEXIS 303 at *10-11 (Bankr. E.D.N.Y. 2022) (collecting cases).  Here, both the mean average and the ranged mean average (utilizing a +/- one standard deviation) of lateness for the Preference Period transfers fall within three to seven days of the historical averages. Therefore, the Court concludes that with respect to average lateness, the transfers here are in the ordinary course.

The Court also overrules the Plaintiff's argument as to the usage of the $42.80 outlier payment.  The Court is not aware of case law requiring that a late payment must be made for a business reason in order to be considered as part of the average lateness analysis under § 547(c)(2)(A).  Additionally, whether this $42.80 payment was overlooked as a result of its year-end date (December 30, 2014) is purely speculation.

Even if the Court adopted the Plaintiff's requested omission of the $42.80 outlier payment, the modified pre-preference mean average range of 4 to 13 days would still be just three and one days apart from the undisputed Preference Period mean average range of 1 to 12 days.  The mean average itself would actually be identical (9 days) between the two periods if the Court credited the Plaintiff's requested modification.  As courts have noted, the average lateness analysis involves comparing the average times between the two periods, and measuring the discrepancy in days between those two averages.  *See Quebecor World*, 518 B.R. at 762-63.  Courts have also rejected the argument that any preference period payment is ordinary if it falls anywhere within the minimum and maximum number of days from invoice to payment during the historical period. *See id.*  Both parties attempt to assert a variation on this method of measurement (*i.e.*, they assert that if a Preference Period payment falls within the historical mean average range (using +/- one

standard deviation), then the payment is ordinary).  The Court finds that this is incorrect, and that the important analysis here is to compare the averages between the historical and preference periods and to determine how many days apart these two averages are.[12]

The Plaintiff also argues that Berk's report as to the *Pereira* factors is flawed for several other reasons.  *See* Pederson Report at 12-13.  The Court will address two of those arguments here; the third will be addressed at the end of the "timing of the payments" section below.

First, the Plaintiff points out that the transaction data contained in excel spreadsheets, used by McKesson Systems to undertake its ordinary course defense analyses, and pulled from the SAP and Epicor data which form the actual basis of the Debtor's books and records, was never produced to the Plaintiff.  *See* Pederson Report at 12-13.   The Court finds this fact weighs slightly in favor of the Plaintiff as a sufficiency of evidence issue underlying McKesson Systems' § 547(c)(2)(A) defense.

Second, the Plaintiff took issue with the use of a nine-month historical period, especially given the decision to use such a period was unexplained by Berk, and differed from the 12-month and 10-month periods used by McKesson Systems in analyzing average lateness in the Specialty Adversary Proceeding and the Primary Proceeding respectively.  *See* Pederson Expert Report at 11.  The Court does not see anything wrong with the use of a nine-month historical period here. McKesson Systems' expert Berk addressed this at Trial, and responded that though a 12-month period is typically what he looks for, the nine months of information was what was made available to him by McKesson Systems due to a change in internal systems at McKesson that occurred

---

[12] McKesson Systems asserts that because 15 of the 16 invoices paid during the Preference Period were paid within the historical range of 1 to 19 days, the payments on account of those 15 invoices are therefore ordinary.  *See* Berk Report at 18-19.  Similarly, the Plaintiff also concluded that because certain of the transfers fall outside its modified mean average range (excluding the $43 "outlier" payment), those payments were not in the ordinary course.  *See* Pederson Report at 10-11.  This is not a methodology the Court will apply here.

"around March or April of 2015." *See* July 18 Hr'g Tr. at 90:9-17; 92:17-24. The Court is not aware of any case law requiring a specific historical period length of time to compare Preference Period payments to. Cases have only specified that the historical period has to go back "well before" the Preference Period so as to "reduce the likelihood that the debtor's financial difficulties had already taken hold during the historical period and thus distort otherwise 'ordinary' practices under regular financial conditions." *Quebecor World*, 518 B.R. at 762 (citations omitted). The Court did not see any evidence put forth that the nine-month historical period used here, as opposed to a 12-month historical period, somehow increased the likelihood that the historical period data was distorted in such a manner that a 12-month lookback period might have corrected.

### ii.    Amount of the Payment

The second factor, amount of the preferential payment weighs in favor of McKesson Systems. As compared to the historical period, the amounts during the Preference Period were exactly the same as the amounts of the payments during the last five months of the historical period, with a slight decrease of $559.43 as compared to the first four months of the historical period. Each of the Facility Based Fee payments made during the Preference Period was also equal in value to a specific invoiced amount. *See* Berk Report at Ex. 1.

### iii.    Timing of the Payments

Aside from the average lateness analysis discussed above, the Plaintiff also argues that the payment obligation for the third Facility Based Fee invoice here was accelerated because the final invoice dated June 8, 2015 was issued just 12 days after the prior Facility Based Fee invoice, and that this "therefore accelerate[d] A&P's payment obligations substantially." *See* Pederson Report 9. The actual payment made on this third Facility Based Fee invoice occurred on July 11, 2015, three days after its July 8, 2015 due date. *See* Berk Report at Ex. 1.

Although no courts in this Circuit have discussed the effect of accelerated payments on the ordinary course defense, the Third Circuit upheld a bankruptcy court's finding that a creditor did not have an ordinary course of business defense where payments were accelerated by the creditor upon learning the debtor was struggling financially. *See Burtch v. Prudential Real Estate & Relocation Servs. (In re AE Liquidation, Inc.)*, 729 Fed. Appx. 153, 157–158 (3d Cir. 2018). In affirming the bankruptcy court's decision, the circuit court highlighted that the bankruptcy court did not consider the faster payment rate in isolation, but rather considered the accelerated rate "in the context of the parties' relationship, similarity of transactions, the manner in which payment was tendered, [the creditor's] unusual collection efforts during the Preference Period, and [the creditor's] actions after learning of [the debtor's] financial hardship." *Id.* at 158.

The Court disagrees with the Plaintiff's reading of the relevant dates. At first glance, it seems possible that McKesson Systems chose to issue the third Facility Based Fee invoice several weeks sooner than the usual established monthly recurrence established in the historical period, and that this in turn might indicate that McKesson Systems sought accelerated payment of that third Facility Based Fee payment. However, this invoice was not issued several weeks sooner, but instead appears to have been issued a few days later than the usual established monthly recurrence. If one tracks the historical pattern of payments going back to November 1, 2015, the June 8, 2015 invoice really should have been issued on June 1, 2015, not July 1, 2015, as the Plaintiff argues. *See* Berk Report at Ex. 1 & 2. The first Facility Based Fee invoice in the Preference Period was issued 6 days sooner than it should have (it was issued on March 25, 2015 rather than April 1, 2015), as the prior Facility Based Fee was issued on March 1, 2015. *See id.* The next invoice then should have been issued on May 1, 2015, but was issued on May 27, 2015. The final invoice then should have been issued on June 1, 2015, but was issued on June 8, 2015. Thus, McKesson

19

Systems could not have been seeking accelerated payment by issuing its third Facility Based Fee invoice when it did because it was issued later, not sooner, than when it should have been, according to the established historical period's invoice timing.

The Court thus concludes that the payment on the final Facility Based Fee was not accelerated by McKesson Systems based purely on the fact that the final invoice was issued "only 12 days after the May 27 invoice. . . therefore accelerat[ing] A&P's payment obligations substantially." As to the second Facility Based Fee payment made on June 30, 2015, the Plaintiff did not argue that this payment was also accelerated (and nothing on the face of it appeared accelerated about it, as it was in fact paid four days late).

However, the Court does agree with the Plaintiff that there were still significant changes in the timing of payments during the Preference Period compared to the historical period. The Plaintiff's expert Pederson noted that the Berk Report indicates that the timing of the Facility Based Fees, though not accelerated, did change somewhat significantly during the Preference Period as compared to the historical period. *See* Pederson Report at 8. McKesson Systems invoiced A&P for the Facility Based Fee on the first day of each month for each of the five months preceding the Preference Period. *See id.* But during the Preference Period, McKesson Systems invoiced A&P for the Facility Based Fee 24 days, then 63 days, then 12 days after the prior invoice. *See id.* This pattern during the Preference Period was irregular even as measured against the first four months of the historical period, where McKesson Systems regularly invoiced A&P monthly on or around mid-month. *See* Berk Report at Ex. 2. Thus, given these significant changes in the timing of payments, both within the historical period and as compared to the Preference Period, this factor weighs in favor of negating the ordinary course defense here.

20

      iv.    Circumstances of the Payment and Presence of Unusual Debt Collection Practices

The Plaintiff also asserts that McKesson Systems asserted undue pressure on A&P to pay such that the Facility Based Fees paid during the Preference Period were not paid in the ordinary course. Courts have held that "[p]ayments made as a result of unusual economic pressure and unusual debt collection practices are not in the ordinary course of business." *In re Pameco Corp.*, 356 B.R. at 340; *Gold Force Int'l v. Official Comm. Of Unsecured Creditors of Cyberrebate.com, Inc.*, 2004 WL 287144, *5 (E.D.N.Y. Feb. 10, 2004).

Similar to the reasoning set forth in the Preference & Stay Violations Opinion, the Court finds that McKesson Systems' conduct did not rise to the level of undue pressure sufficient to take the payments out of the ordinary course. Email records show that McKesson Systems did send a number of emails requesting immediate payment and urging A&P to "get current." *See* "S&P" Decl. of Dawn DeVito: McKesson Specialty and Pharmacy [ECF No. 86] at 7 (citing to PX 145). McKesson Systems also threatened to send a cure letter pursuant to § 5.2 of their License Agreement, which would suspend McKesson System's software services completely, if accounts were not brought current by overnight wire. *See id.* at 7.

However, the Court first notes that the last Facility Based Fee invoice was in fact paid by check dated July 8, 2015, before McKesson Systems' emails to A&P threatening to suspend shipment and services, which was sent on July 10, 2015. *See id.* at p. 8 (citing to PX 147). So even if that threat to suspend shipment constituted undue pressure to pay, that pressure could not have compelled A&P to make that last Facility Based Fee payment, or the ones prior to that. While it is true that McKesson Systems sent emails to A&P before July 8, 2015 on account of the last Facility Based Fee invoice, these were only requests for immediate payment of that invoice and not threats to suspend services entirely. *See id.* at 8-9.

21

As discussed in the Preference & Stay Violations Opinion, even in the absence of the other *Pereira* factors, the Plaintiff could successfully avoid transfers resulting from coercion or pressure if McKesson Systems engaged in collection practices during the Preference Period that substantially differed from their historical period collection practices, or if McKesson Systems threatened A&P such that A&P had no choice but to pay on time or risk the shutdown of their business. *See In re Pameco Corp.*, 356 B.R. at 340*; Cyberrebate.com*, 2004 WL 287144 at *5; *see also Shodeen v. Airline Software, Inc., (In re Accessair, Inc.)*, 314 B.R. 386, 394 (B.A.P. 8th Cir. 2004) (negating ordinary course defense where creditor threatened to cut off software support, essentially rendering debtor inoperable).

Here, there is some similarity to the facts in *Accessair*. If McKesson Systems cut off the System Software support, this would essentially render A&P's pharmacy business inoperable. The record also indicated that it would not have been easy for A&P to find a replacement software provider in a short period of time. *See* Pederson Report at 6 (citing to Carnahan's deposition transcript at 145-46, 177). However, the evidentiary record does not establish that, as in *Accessair*, the relationship between A&P as an entire operating entity and McKesson Systems was such that A&P would cease to operate without McKesson Systems' uninterrupted support, although A&P's pharmacy business might have been rendered inoperable for some material period of time. *See In re Accessair, Inc.*, 314 B.R. at 390.

### v.    Changes in the Means of Payment

The last factor, changes in the means of payment, does not apparently weigh in favor of either party, but given the burden of proof is on McKesson Systems, the Court finds this factor weighs slightly in favor of the Plaintiff. McKesson Systems implicitly (though not expressly) asserted, that all of the payments made during the Preference Period appeared to have been

22

transmitted via electronic funds transfer, the same way in which all the historical period payments appeared to have been made pursuant to the License Agreement. *See* Berk Report at 12 (describing the License Agreement and noting that "[a]ll payments were to be made in United States currency and via electronic funds transfer ("EFT")"). However, McKesson Systems presented no actual evidence of this, as the Plaintiff's expert Pederson pointed out. *See* Pederson Report at 11 ("the Berk Pharmacy Report fails to provide information about whether A&P paid by check or ACH").

vi.   Conclusion

Thus, considering the *Pereira* factors as a whole, the Court finds that McKesson Systems does not have an ordinary course defense pursuant to § 547(c)(2)(A) with respect to the Facility Based Fees.

b.  The Remaining Transfers

As to the Remaining Transfers, the Court finds that McKesson Systems has also failed to meet its burden to prove that the ordinary course defense applies to any of them as well.

i.   The Prior Course of Dealing Between the Parties

Given the legal standard and discussion regarding the average lateness analysis are the same for the Remaining Transfers and the Facility Based Fees, the Court incorporates by reference the discussion set forth *supra* in the Facility Based Fee discussion regarding that analysis here.

Additionally, the Court notes that with respect to the Remaining Transfers specifically, McKesson Systems' failure to discuss at all what any of these specific payments were actually made on account of makes it harder for the Court to determine that there was a historical baseline of dealings that could be meaningfully compared to the Parties' Preference Period activity.[13]

---

[13] Although McKesson Systems' expert Berk does cite to the License Agreement and discusses the various types of fees owed to McKesson Systems pursuant to that agreement, Berk failed to identify what types of fees each of the Remaining Transfers were made on account of, although as noted previously, the Parties did seem to agree that the three recurring payments for $99,578.20 were for the Facility Based Fee. *See* Pederson Report at 8. As the Plaintiff's

23

While the License Agreement describes in some detail various different categories of fees owed to McKesson Systems (*e.g.*, "Interface Fees," a "Hosting Configuration, Setup and Training" Fee, and an "Implementation Fee", the Court was not able to determine which category of fees, if any, each of the line items in both the historical period and Preference Period were related to. And the Court notes that as a matter of contract interpretation, many if not all of these other fees appeared to be incurred at the beginning of the Parties' course of performance.[14] *See* License Agreement at 17-18.

In order to fully assess whether the payments were in the ordinary course of the debtor's and McKesson Systems' business relationship, the Court would need to know a little more about the basic identity of each of these Remaining Transfers. Upon reviewing the historical data, there do seem to be recurring invoices issued that are for approximately the same amount and at approximately similar intervals (*e.g.*, $85.60 payment occurs almost every month, but invoice date changes randomly month-to-month from at or around mid-month to beginning of the month). However, the Court finds it hard to extrapolate from these apparent patterns that there, more likely than not, was an ordinary course of transacting between the parties without knowing with substantially more certainty what type of service or fee the payments were actually for.

ii.   Amount of the Payment

The second factor, amount of the preferential payment, weighs in favor of the Plaintiff. As the Plaintiff points out, the timing and amounts of the Remaining Transfers are not very consistent

---

expert Pederson noted, McKesson Systems did not even produce its bank statements, which, as just one example, might potentially have provided some color on what the Remaining Transfers during the Preference Period were for.

[14] "Client agrees to pay the Standard Implentation Fee as follows: (i) 50% of the Standard Implementation Fee upon contract signing; (ii) 25% of the Standard Implementation Fee upon the earlier of (a) the Implementation Date of the first Facility; or (b) 270 days from the Effective Date; and (iii) 25% of the Standard Implementation Fee on March 1, 2008 . . . Client agrees to pay 50% of the Interface Fee upon contract signing and 50% upon go-live of the first Facility . . . Client agrees to pay 50% of the HCST Fee upon contract signing and 50% on March 1, 2008." *See* License Agreement at 17-18.

during the historical and Preference Periods. *See* Pederson Report at 11-12; Berk Report at Ex. 1 & 2. None of McKesson Systems' invoices during the historical period were for amounts between $500 and $99,000, yet McKesson Systems claims that four of the Remaining Transfers between $1,000 and $8,000 during the Preference Period were in the ordinary course. *See* Pederson Report at 11-12; Berk Report at Ex. 1 & 2. Also, the Plaintiff's expert Pederson points out that McKesson Systems invoiced A&P for the amount of $85.60 at irregular intervals at six occasions during the historical period, but did so only once during the Preference Period. As noted previously, McKesson Systems' failure to provide evidence showing what these Remaining Transfers were for, coupled with the foregoing irregularities and inconsistent patternings, makes it difficult for the Court to conclude the amounts of the Remaining Transfers were consistent between the historical period and the Preference Period.

iii.    Timing of the Payments

Unlike with the Facility Based Fees, the Plaintiff did not argue that any of the Remaining Transfers were accelerated as compared to the historical period. The Court did not note any specific disputes between the Parties with regard to changes in the timing of payments after the Preference Period (other than the dispute over the average lateness of payments as discussed previously). However, the Plaintiff notes, as the Court does, that McKesson Systems' expert Berk provided no analysis of whether any of the items McKesson Systems invoiced A&P for other than the Facility Based Fees during the Preference Period (i.e., the Remaining Transfers) followed a particular payment pattern. Given the burden of proof rests with McKesson Systems, this factor weighs in favor of the Plaintiff.

        iv.     Circumstances of the Payment and Presence of Unusual Debt
Collection Practices

For the same reasons as stated in the previous section with regard to the Facility Based

Fees, the Court finds that the threats here did not rise to a sufficient level so as to take the transfers

out of the ordinary course.  Also, none of the Remaining Transfers were made after July 10, 2015,

the date when McKesson Systems threatened to stop shipments and services entirely.  *See* PX 147.

So even if that threat to suspend shipment constituted undue pressure to pay, that pressure could

not have compelled A&P to make any of the Remaining Transfers (other than potentially the last

one on July 10, 2015).

        vii.    Changes in the Means of Payment

The last factor, changes in the means of payment, is also a non-factor in this case.

McKesson Systems implicitly (though not expressly) asserted, and the Plaintiff did not contest,

that all of the payments made during the Preference Period appeared to have been transmitted via

EFT, the same way in which all the historical period payments appeared to have been made

pursuant to the License Agreement.  *See* Berk Report at 12.

        viii.   Conclusion

Thus, considering the *Pereira* factors as a whole, the Court finds that McKesson Systems

does not have an ordinary course defense pursuant to § 547(c)(2)(A) with respect to the Remaining

Transfers.

### 2.  The Objective Test

In its expert report and at Trial, McKesson Systems appeared to assert an ordinary course

defense pursuant to the objective test per § 547(c)(2)(B) only as a mere footnote.  *See* Berk Report

at 14.  There is no discussion of the objective test analysis in McKesson's pre- or post-trial briefing

in the particular context of this McKesson Systems Proceeding.  Similarly, Berk's expert report

merely refers the Court to Mr. Kosty's testimony to come at Trial "as to the objective test regarding industry standard in the pharmaceutical supply business." *See* Berk Report at 14, fn. 27. It appears that Mr. Berk is referring to Mr. Kosty's and Mr. Iampietro's (and others) testimony at Trial regarding industry standards in the pharmaceutical supply business generally, which testimony largely focused on whether threats of non-shipment after payment default would be ordinary or not in standard industry practice. So, the Court will refer to that testimony in its analysis here, as it was unable to find any testimony as to industry standards within the particular context of the pharmacy software services at issue in this case.

Under § 547(c)(2)(B) of the Bankruptcy Code, creditors may retain an otherwise preferential payment if it was made on terms standard to the "general practices in the industry, in particular the industry of the creditor." *Abovenet, Inc. v. Lucent Tech., Inc (In re Metromedia Fiber Network, Inc.)*, 2005 WL 3789133, *5 (Bankr. S.D.N.Y. Dec. 20, 2005). The Second Circuit has held that "ordinary business terms" should be liberally construed "and that 'only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary.'" *Roblin*, 78 F.3d at 39–40 (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993). Creditors need only show that the terms of the transaction were within the outer limits of particular industry practices, allowing for significant behavioral latitude.[15] *See id.* Moderate variance from the industry's objective norms is thus insufficient to find departure from those norms. *See id.*

McKesson Systems bears the burden of proving by a preponderance of the evidence that the transfers in this case were made according to ordinary business terms. *See Stanziale v. Southern Steel & Supply, L.L.C., (In re Conex Holdings, LLC)*, 518 B.R. 269, 279 (Bankr. D. Del.

---

[15] Put another way, the inquiry under § 547(c)(2)(B) is "whether 'a particular arrangement is so out of line with what others do' that it cannot be said to have been made in the ordinary course." *Id.* (citing *Leidenheimer, 439 F.3d* at 239 (quoting *In re Gulf City Seafoods*, 296 F.3d 363, 369 (5th Cir. 2002))).

2014).    Courts accept expert testimony as to industry standard business practices, witness testimony of events between the parties, and the business records and invoices of the parties, as evidence to prove this defense. *See id.* at 285–86; *Pereira*, 508 B.R. at 829-30 (Bankr. S.D.N.Y. 2014). Under this objective standard, the Parties' dealings during the Preference Period are not compared to the Parties' historical practices, but rather to a normative baseline set by a preponderance of the evidence. *See id.* Notably, the question is whether the conduct and terms employed during the Preference Period was comparable to the conduct and terms employed by similarly situated debtors and creditors facing the same or similar circumstances (*i.e.*, a debtor facing financial distress). *See Roblin*, 78 F.3d at 42 ("Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workout and unfairly penalizes those creditors that take conventional steps to institute a repayment plan.").

As discussed in the Preference & Stay Violations Opinion, both Parties at Trial brought forth fact and expert witnesses to testify to their respective positions, and the Court has reviewed the voluminous body of business documents and communications records submitted by each side. McKesson's industry expert, Timothy Kosty, asserted his beliefs that: (1) the overarching Supply Agreement (at issue in the Primary Proceeding) contained no abnormal terms, (2) McKesson never deviated from those terms, and (3) threats of non-shipment after payment default were not necessarily out of the ordinary even in the absence of an explicit contractual provision. *See* July 12, 2024 Hr'g Tr. [July 16, 2024 Hr'g Tr. [ECF No. 95] at 240–242 No. 94] at 76-78 ("The industry perspective, if you don't pay your bill, you don't get supply.").[16]

---

[16] Article 2 of the Uniform Commercial Code is applicable across supplier-retailer relationships in many industries besides pharmaceutical distribution, and so its terms may assist in discerning the most basic of expectations between sophisticated firms.  In the event that a buyer repudiates their obligation to pay for shipments of goods, a supplier may rightfully withhold that shipment under § 2-703(a).

However, the Plaintiff's own industry expert, Steven Iampietro, found McKesson's threats objectionable, declaring that McKesson "behaved as a bully" and that threats of non-shipment would have "not ordinarily been considered as part of [a] wholesalers' arsenal for dealing with struggling strategic retailers in or after 2015." *See* Expert Decl. of Steven A. Iampietro [ECF No. 87] at 7. However, Iampietro also stated that exercising similar default terms within his own employer's credit manual would also amount to "minor bullying."[17] *See* July 12, 2024 Hr'g Tr. [ECF No. 94] at 153–54. Iampietro further criticized McKesson's behavior by proposing hypothetical courses of action that, in his view, would have achieved the same results without threatening to disrupt the pharmacies.[18] *See* Expert Decl. of Steven A. Iampietro [ECF No. 87] at 9–10.

Carnahan strongly echoed Iampietro's testimony with his characterization of McKesson as a "uniquely aggressive creditor" who "behaved as a bully," but when questioned at Trial, admitted that other major suppliers to A&P had actually curtailed shipping when Carnahan failed to pay their outstanding bills on time." *See* July 16, 2024 Hr'g Tr. [ECF No. 95] at 240–242; July 17, 2024 Hr'g Tr. [ECF No. 96] at 73–74. On cross-examination, Carnahan also discussed his previous experience at another major retailer, which was also facing financial struggles and suppliers potentially cutting them off when bills went unpaid. Regarding those threats, however, Carnahan averred that he "think[s] that is the standard commercially," and added, "You've got to pay for it if you're going to get it." July 16, 2024 Hr'g Tr. [ECF No. 95] at 242.

---

[17] Iampietro worked for AmerisourceBergen's credit department for nearly two decades. AmerisourceBergen and McKesson control the pharmaceutical distribution market, along with one other competitor.

[18] These suggestions were all roundly criticized as unworkable by McKesson's witness Jenifer Towsley. *See* Decl. of Jenifer Towsley [ECF No. 162] at 24-28. For example, Towsley noted in her trial declaration that any negotiations with A&P "to reduce its financial exposure by consensual means" would likely have taken the transfers out of the ordinary course of business. *See id.* at 27.

The Plaintiff in this Systems Adversary Proceeding points to much the same record of emails, calls, and other communication records as put forth in the Primary Proceeding evidencing McKesson's apparent pressure applied on A&P to pay outstanding bills. *See* Pederson Report at 5-7. This includes the threats regarding the transfer on May 22, 2015 (*i.e.*, the accelerated payment) in the Primary Proceeding, which caused A&P to change payment methods from ACH to a same-day wire payment, something it had never done before. *See id.* at 5-6.

Even assuming that these various emails and threats (which largely deal with transfers made in the Primary Proceeding) provides evidence that those threats also applied to the payments made to McKesson Systems during the Preference Period, the Court concludes here, similar to its analysis in the Preference & Stay Violations Opinion, that those various threats did not rise to a level sufficient to take them out of the objective ordinary course of business pursuant to § 547(c)(2)(B) because such "threats" were not a deviation from the general practices in the industry. *See Roblin,* 78 F.3d at 39-40. Indeed, some of A&P's other suppliers actually cut off shipments upon non-payment, adding credence to Carnahan's opinion on the commercial standard, as does his previous experience with financially distressed retailers. *See* July 16, 2024 Hr'g Tr. [ECF No. 95] at 242; July 17, 2024 Hr'g Tr. [ECF No. 96] at 73–74. Had McKesson Systems actually withheld services at any point in time, the Court would be less confident in its conclusion. In the instant case, it appears that McKesson Systems did no more than "sabre rattle." July 12, 2024 Hr'g Tr. [ECF No. 94] at 165.

However, the Court ultimately concludes that McKesson Systems' expert report (and the evidentiary record underlying that report) is ultimately too incomplete for the Court to be able to ascertain the Parties' adherence to a course of performance that was in line with the normative baseline of industry practices at large. *See In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th

Cir. 2002) ("We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue.").

For example, as to the Facility-Based Fees, the Plaintiff's expert Pederson noted that the Berk Report indicates that the timing of the Facility Based Fees changed somewhat significantly during the Preference Period as compared to the historical period. *See* Pederson Report at 8. McKesson Systems invoiced A&P for the Facility Based Fee on the first day of each month for each of the five months preceding the Preference Period. *See id.* But during the Preference Period, McKesson Systems invoiced A&P for the Facility Based Fee 24 days, then 63 days, then 12 days after the prior invoice. *See id.* This pattern during the Preference Period was irregular even as measured against the first four months of the historical period, where McKesson Systems invoiced A&P on or around mid-month. *See* Berk Report at Ex. 2. Absent some valid explanation for these changes in payment timing, and establishing some connection with that explanation to industry practice at large (both of which McKesson Systems failed to do here), the Court simply cannot conclude that such payment timing changes would have been ordinary in industry practice at large.

As to the Remaining Transfers, as noted in the previous analysis under § 547(c)(2)(A), McKesson Systems did not even provide a description of what each of those charges were specifically for. It is difficult, if not impossible, for the Court to determine whether any of the Remaining Transfers were within the objective ordinary course of business between the Parties when: (a) the specific charges were not described at all and (b) no specific evidence was put forth regarding how those charges fit next to examples from industry practice at large (other than that threatening to cut off shipments if bills went unpaid was ordinary in the industry). Thus, the Court concludes that the Remaining Transfers are also not shielded from avoidance by § 547(c)(2)(B).

31

### C. To What Extent is McKesson Systems' Preference Liability Reduced on Account of its Provision of Subsequent New Value?

As discussed above, the Court has determined that none of the transfers here are shielded from avoidance by other valid § 547(c) defenses. Thus, the Court may apply the subsequent new value defense under § 547(c)(4) (the "SNV Defense") to all of the transfers.[19] *See In re Dots, LLC*, 562 B.R. 286, 295 (Bankr. D. N.J. 2017) (holding that in fact, in order to determine validity of new value defense under section 547(c)(4), court must necessarily undertake examination of whether transfers are unavoidable as protected by other section 547(c) affirmative defenses, such as an ordinary business terms defense).[20]

However, in this case, McKesson Systems admitted in its expert report that only the Facility Based Fee invoices and a "label fee" invoice could be used as new value provided.[21] *See* Berk Report at 20, Ex. 1. Thus, the Court will not use the non-Facility Based Fee payments (other than the "label fee") made during the Preference Period for purposes of the new value calculation. Further, McKesson Systems calculated the new value provided by the facility and label fees on a per diem basis, based on the number of days the respective monthly invoice covered and the timing of transfers between the Debtors and McKesson Systems during the Preference Period. *See id.* The Plaintiff did not object to McKesson Systems' per diem calculation and agreed that McKesson Systems' preference exposure net of only the SNV Defense was no less than $141,820.18. *See*

---

[19] *See also In re IRFM, Inc.*, 52 F.3d 228, 233 at fn. 6 (9th Cir. 1995) ("... once a creditor has successfully asserted a defense under section 547(c)(1), (2), or (3), it may not attempt to assert a defense under section 547(c)(4) for the same preferential transfer.")

[20] Additionally, the Court incorporates by reference the section of the Preference & Stay Violations Opinion holding that the invoice amount of merchandise delivered during the Preference Period is the proper method of valuing said merchandise for purposes of calculating the SNV Defense. *See* Preference & Stay Violations Opinion at 46-49.

[21] The Berk Report does not define what a "label fee" is. But upon reviewing Exhibit 1 to the Berk Report, which sets forth Berk's new value defense calculation, it appears Berk is referring to a single amount invoiced on June 26, 2015, for which a service was provided or good delivered on July 11, 2015, in the amount of $3,212.20.

32

Pederson Report at 14; Berk Report at Ex. 1; Pl's Post-Trial Br. at 33-34. The Court thus incorporates by reference McKesson Systems' calculation of its SNV Defense as set forth in Exhibit 1 to the Berk Report.

Nonetheless, the Plaintiff asserts that the net preference exposure of $141,820.18 is understated by at least $41,758.60 because "it includes that amount both as part of its ordinary course of business defense and as new value that reduces Pharmacy's preference liability." *See* Pederson Report at 14-15. The Court disagrees and finds that the net preference exposure is not understated as though McKesson Systems' SNV Defense calculation includes two of the Facility Based Fee payments both for purposes of the ordinary course defense and for purposes of the new value calculation (which would be impermissible), the Court here already found that none of the Facility Based Fee payments were shielded from avoidance by McKesson Systems' ordinary course of business defense.

The Plaintiff also asserts that the SNV Defense should be reduced to the extent that the Court holds that new value must remain unpaid to shield a preference. *See* Pederson Report at 14. But this Court concluded in a different opinion that new value does not need to remain unpaid to shield a preference. *See* Memorandum Opinion, dated Jan. 18, 2024, Case No. 17-08264 [Adv. Proc. ECF No. 141] at 16-18.

## IV.   CONCLUSION

In summary, this Court rules as follows:

1. Each of the transfers in the McKesson Systems Proceeding enabled McKesson Systems to receive more than it would have received if the Main Case were a case under chapter 7, the transfer had not been made, and McKesson Systems received payment on such debt to the extent provided by the provisions of the Bankruptcy Code.

2.  None of the transfers in the McKesson Systems Proceeding are shielded from avoidance on account of McKesson Systems' § 547(c)(2) ordinary course of business defense.

3.  After accounting for McKesson Systems' SNV Defense pursuant to § 547(c)(4), the Plaintiff can, pursuant to §§ 547 and 550, avoid and recover $141,820.18 from McKesson Systems.

4.  The Plaintiff is directed to submit a proposed form of judgment consistent with this Opinion.

Dated: June 17, 2026
       New York, New York

                                        */s/ Lisa G. Beckerman*
                                        THE HONORABLE LISA G. BECKERMAN
                                        UNITED STATES BANKRUPTCY JUDGE

34